(June 30, 1922.)

STATE, Respondent, v. WILLIAM D. GROVER, Appellant.

[207 Pac. 1080.]

JUSTIFIABLE HOMICIDE — SELF-DEFENSE — EVIDENCE — PRESUMPTION OF INNOCENCE.

1. One who is suddenly attacked by another has a right to protect his own life and bodily security by such means as may be available, provided he is in present fear of receiving great bodily injury and uses no greater force than necessary to repel the attack, in view of the exigencies of the situation as it appears to him as a reasonable man.

2. Where in a criminal prosecution the undisputed evidence is entirely consistent with the defendant's innocence and the jury nevertheless returns a verdict of guilty, the trial court commits error in refusing to grant the defendant a new trial.

3. Where in a prosecution for murder the evidence shows that the defendant was attacked by the deceased with a shovel, that the defendant warded off the first of deceased's blows with his own shovel, that deceased then struck a second blow at defendant which the latter dodged, and was in the act of administering a third blow when he was fatally struck by defendant, *held* that the homicide was justifiable.

APPEAL from the District Court of the Sixth Judicial District, for Bingham County.    Hon. F. J. Cowen, Judge.

Prosecution for murder; conviction of involuntary manslaughter. Appealed. Judgment *reversed.*

Thomas & Anderson, for Appellant.

The appellate court will examine the evidence to ascertain whether or not the verdict is supported by the evidence. (*State v. Jones,* 25 Ida. 587, 138 Pac. 1116; *State v. Donnington,* 246 Mo. 343, 151 S. W. 975; *State v. Baker,* 6 Ida. 496, 56 Pac. 81; *State v. Anderson,* 6 Ida. 706, 59 Pac. 180.)

Where there is absolutely no evidence to sustain a verdict, or where the evidence so preponderates against the verdict as to justify the presumption that it was rendered under the influence of passion or prejudice, the verdict should be set aside. (*State v. Nesbit*, 4 Ida. 548, 43 Pac. 66; *State v. Trego*, 25 Ida. 625, 138 Pac. 1124; *State v. Seymour*, 7 Ida. 257, 548, 61 Pac. 1033, 63 Pac. 1036; *State v. Marquardsen*, 7 Ida. 352, 62 Pac. 1034; *People v. Kuches*, 120 Cal. 566, 52 Pac. 1002.)

When the circumstances on which a verdict is based can be as reasonably explained upon some other reasonable hypothesis than that of defendant's guilt or as perfectly consistent with defendant's innocence, then a new trial should be granted. (*State v. Nesbit, supra; State v. Seymour*, 10 Ida. 699, 79 Pac. 825.)

Roy L. Black, Attorney General, and James L. Boone, Assistant, for Respondent.

The appellate court will not disturb a judgment based on a verdict in a criminal case where there is substantial conflict in the evidence, but taken as a whole the evidence is sufficient to sustain the verdict. (*State v. Steen*, 29 Ida. 337, 158 Pac. 499; *State v. Mox Mox*, 28 Ida. 176, 152 Pac. 802; *State v. Bouchard*, 27 Ida. 500, 149 Pac. 464; *State v. Hopkins*, 26 Ida. 741, 145 Pac. 1095; *State v. Carlson*, 23 Ida. 545, 30 Pac. 463.)

BUDGE, J.—Appellant was convicted of involuntary manslaughter. This appeal is from the judgment and from an order denying a motion for new trial.

From the record it appears that on the morning of July 7, 1919, an altercation took place between appellant and one Joseph Koury, during the course of which the latter received a fatal blow upon the head from a shovel in the hands of appellant, resulting in cranial fractures and practically immediate death. The evidence tends to show that appellant left his house at about 5:30 A. M., on said date,

and proceeded to a lateral irrigation ditch which runs through his premises, where he checked up the water and made a cut just above the headgate on one side of the ditch, about eighteen inches to two feet deep, for running the water out into his sugar-beet field. Appellant was wearing rubber boots and standing in the water in the cut, placing dirt against the headgate, when, about 7 A. M., the deceased came up. Some conversation ensued, and appellant testified that deceased attempted to remove the boards from the check in the headgate, but that he reached forward with his right hand and prevented deceased from doing so, whereupon deceased became enraged and struck two blows with his shovel at appellant, the first of which struck the shank of appellant's shovel, and the second of which appellant dodged, whereupon appellant, in defense of his person, struck deceased a left-handed blow with his shovel upon the right temporal region, knocking him into the ditch below the headgate. Appellant lifted deceased out of the ditch and laid him on the grass on the ditch bank and immediately notified the sheriff by telephone that he had had trouble with deceased and requested him to come at once. The sheriff arrived at the scene of the homicide shortly thereafter, found the body of the deceased, placed appellant under arrest and conveyed him to the county jail.

An autopsy was held by three doctors who were called to testify upon the trial as state's witnesses and testified as to the condition of deceased's head and that in their opinion he had received two blows rather than one, due to the fact that a slight indentation or depression was found in deceased's skull just above the left eye, but admitted that all the other fractures might have been caused by one blow. A fourth doctor who saw the autopsy and was called as a witness for appellant testified that there was no indentation or depression above the left eye and that all the fractures found might have been and were caused by one blow. There is no evidence in the record which accounts for the indentation or indicates that it was produced by

any act of appellant, nor were there any eye-witnesses to the affray other than appellant.

The jury returned a verdict of guilty of involuntary manslaughter and recommended lenience. Appellant's motion for new trial was overruled, and judgment was rendered, in which he was sentenced to imprisonment for not less than six months nor more than ten years.

Numerous assignments of error are made by appellant, but as we view the case it will be necessary to consider but one, viz., that the evidence is insufficient to support the verdict.

It is undisputed that deceased met his death at the hands of appellant, and the state, as we understand it, practically concedes that if the evidence shows that but one blow was inflicted by appellant, the homicide was committed in self-defense and is justifiable, and there is not sufficient evidence upon which to base a conviction.

Upon the trial, appellant testified in part as follows:

"When he [deceased] went to push the boards out of the headgate I took hold of his right arm with my . . . . right arm . . . . and detained him from taking the checks out of the gate; told him to wait a moment and lets reason this thing out and do it in a proper way, and immediately as soon as I let go of his arm, without saying a word or anything, he . . . . hit at my head with his shovel . . . . As he struck at my head I threw up my shovel. I was holding my shovel in my right hand and threw it up and caught the lick on the shank of my shovel, broke his blow, stopped it from hitting me. Then he struck at my head, this time striking more directly down so that I was not able to catch the lick on my shovel, but managed to dodge his lick. He immediately threw his shovel back to strike the third blow at me and I struck at him, aiming to hit his arm and stop him from striking me. As I struck he ducked down and a little forward and caught the blow on the right side of his head. He turned just slightly until he faced the ditch and pitched forward into the ditch with his shovel under him. As soon as I seen that I knocked him down I

jumped on the bank where he had been standing and stood and looked at him for a second or so to see if he wasn't going to get up, and then I stepped down into the ditch and took hold of him and lifted him on to the ditch bank and looked at him a minute or two longer to see if he appeared to be going to get up and I stepped down into the ditch and picked his shovel up and put it on the bank and took my shovel and went down to Mr. Bernard's place and called the sheriff .... I was standing in the cut in the ditch bank; the water was running out onto the beets; it was muddy. If I moved east I went right into the soft mud, if I went west I went into the irrigating ditch. If I tried to retreat .... I had to go up over the bank about eighteen inches or two feet high, and also sweet clover growing there that was four or five feet high, which made it practically impossible for me to get out of the way.

"Q. Now, at the time that you aimed the blow at Mr. Koury, did you intend to take his life?

"A. No, sir.

"Q. Were you afraid at that time?

"A. Yes, sir.

"Q. Why did you strike at him?

"A. Because I knew that my person was in danger from his blows, the way he was striking at me, and I wished to stop him from striking at me.

"Q. Where did you hit him at that time?

"A. As near as I could tell I hit him on the right side of the head, just in front of the ear.

"Q. What part of the shovel did you strike with? Which way did you hold the shovel?

"A. Well, it was the back of the shovel that struck Mr. Koury.

"Q. The back and flat side, in this manner?

"A. Yes, sir.

"Q. I will ask you if you struck Mr. Koury a blow upon the front of the skull, on the head, at a point approximating this point, or any way about that point as shown on this exhibit?

"A. No, sir, I did not.

"Q. The only place you struck and the only time you struck was on the right side and about this point?

"A. Yes, sir."

Dr. W. E. Patrie, a witness for the state, upon direct examination, in reference to the autopsy performed upon deceased, testified that:

"A. A circular incision was made across the anterior portion of the cranium or across the forehead and back to a point just above and a little posterior to the ears on both sides, and his scalp was laid back, the posterior portion of the scalp laid well back and the scalp from his forehead laid down exposing both orbits in front, and I think it was laid back as far as the Lambdoid suture of the cranium in the rear, and we found two, we thought two distinct fractures, one on the left side extending from a point well within the left orbit outwards to the ridge in front of the superciliary ridge above the eye and extending back for a distance of probably four or five inches straight back to a point an inch posterior to the sagittal suture that runs across the head."

On cross-examination he testified in part as follows:

"Q. Do you want the jury to believe from your testimony that it is impossible for a skull to be fractured on one side from a blow on the other?

"A. No, sir.

"Q. You don't know of your own knowledge there was two blows struck upon the head of Joseph Koury, do you?

"A. No sir . . . . It is my opinion that the two blows were struck. I don't say my opinions are absolutely correct.

"Q. So that you have information that a person can be hit on one side of the head and the skull fractured on the other side, haven't you?

"A. Yes, sir.

"Q. Was the skin at any point on the head of the deceased broken?

"A. No, sir.

"Q. The skin and tissue were intact all over the head?

"A. Yes, sir.

"Q. You noticed one swelling on the head and that was on the right side?

"A. Yes, sir, right side.

"Q. And that is the only place there was any swelling?

"A. Yes, sir."

Dr. H. J. Simmons, called as a witness by the state, testified on cross-examination in part as follows:

"Q. And the question of whether a cranium might be fractured on the opposite side from the point of impact depends entirely on the nature and force of the blow, doesn't it?

"A. Force and direction of the blow and the resistance of the skull.

"Q. And if struck by a flat instrument be more liable to produce a bursting effect than if struck by a comparatively small·instrument?

"A. Yes, sir.

"Q. . . . . why should you say, after saying it would depend on the ·nature of the instrument and the force of the blow the making of a fracture of that kind, when you were not present, didn't know what kind of an instrument was used or the force of the blow, ·that it would be impossible to make that kind of a fracture?

"A. For the simple reason that this fracture was depressed in front.

"Q. And it is a linear fracture isn't it, doctor?

"A. It is.

"Q. And as the books say usually caused by bursting?

"A. Yes, sir."

On direct examination, Dr. F. W. Mitchell, a witness for the state, testified:

"Q. I will ask you to give your reasons for the opinion you have expressed to the effect that the injuries were not done with one blow.

"A. There was a distinct fracture on the right side and a depression over the wing of the temporal bone and a

fracture through this line of suture and over to another fracture from the left side and about an inch or such a matter above the ridge of the eye and a slight depression and I could not see how he could get this from this, get the two depressions from one blow."

On cross-examination he testified that:

"Q. . . . . You don't think that a blow on one side of the head would produce a fracture as you have testified to on the right?

"A. Yes, sir, that could be done.

"Q. All those fractures could have, as a matter of fact, been produced at the point you have mentioned here?

"A. All except this depression."

Dr. C. M. Cline, also called as a witness for the state, testified, on cross-examination:

"Q. I will ask you, doctor, if you think it is impossible for a person to be struck on the head at this point here by an instrument such as the shank of a shovel . . . . sufficiently hard to fracture as indicated on this . . . . illustrated skull, whether or not it would be impossible to produce a bursting fracture over here?

"A. In my opinion, yes.

"Q. Do you know of your own knowledge that that couldn't be done?

"A. In my opinion it could not be done. . . . . One learns in fractures to know nothing of his own knowledge.

"Q. In other words, you can never tell in looking at fractures?

"A. The fracture is very erratic.

"Q. A blow made at one place might cause any kind of a fracture?

"A. Yes, sir."

Dr. W. W. Beck, a witness called on behalf of appellant, testified on direct examination that:

"Q. I will ask you, doctor, if there was at or near or approximately at a point over the left eye any depression or indentation as represented here . . . . ?

"A. There was no depression at all on this side of the head. . . . .

"Q. Now, I will ask you, doctor, if in your opinion a blow on the right side of the head such as you found upon the deceased, made with a shovel, could have produced all of the fractures . . . . which you found upon the head of Joseph Koury.

"A. Yes, sir."

There is no competent evidence in the record to support the theory that fractures in the skull of the deceased, as described by the state's expert witnesses, could not have been caused by one blow. However, these same witnesses testified that the slight depression over the left eye was not in their opinion caused by the same blow that produced the fractures. Conceding that there was a slight depression over deceased's left eye, still there is a total lack of evidence that the slight depression was due to any act of appellant. The skin over the slight depression was not even broken. There was no swelling or discoloration. This slight depression may have been due to many causes wholly unconnected with the appellant. When we take into consideration all of the evidence, it is apparent that there is no sound reason suggested which leads to the conclusion that the depression was attributable to appellant rather than to some cause unknown. The fact that the slight depression was found, connected with the admission of appellant that he struck the deceased with his shovel, may have been sufficient to create in the minds of the jury a suspicion that the slight depression was due to some act of appellant. But at most this suspicion must of necessity rest upon a mere inference, and it will hardly be contended that appellant's conviction should be upheld if supported by a mere inference only, in the face of the universally accepted rule that the evidence must establish appellant's guilt beyond a reasonable doubt and to a moral certainty. If there was a second blow attributable to appellant, it is lamentable that there was no competent evidence to establish this fact. We understand the rule to be

that where evidence can be reconciled either with the theory of innocence or of guilt, the law requires that the theory of innocence be adopted.

If appellant was attacked by deceased with a shovel in the manner as testified to by him, he was clearly justified in defending himself and the homicide was justifiable, upon the ground that he had a right to protect his life or to avoid receiving great bodily injury at the hands of the deceased, provided he was in present fear and used no greater force than was necessary in view of the exigencies of the situation as it appeared to him as a reasonable man.

The evidence is undisputed that the deceased struck one blow, which appellant warded off with his shovel. In this appellant is corroborated by proof of the indentation left upon his shovel. Appellant further testified, and in this he is uncontradicted, that the deceased struck a second blow, which he dodged, and was in the act of striking a third blow when appellant struck the deceased, causing the injuries from which he died. Appellant stated that just as he struck the deceased, the latter "ducked down and a little forward and caught the blow on the right side of the head; that he aimed to strike him on the arm." There is no evidence of malice, premeditation or illwill shown to have existed in the mind of appellant against the deceased.

From the whole evidence, we think it clearly appears that the killing was accidental and not intentional. We think it can be fairly said that the undisputed evidence in this case is entirely consistent with the appellant's innocence, and if the settled rules of law uniformly recognized in the trial of criminal cases are to be applied, it becomes our duty to so declare and grant appellant a new trial.

We therefore conclude that the trial court erred in refusing to grant a new trial in this case. From what has been said, it follows that the judgment must be reversed, and the cause remanded, and it is so ordered.

Rice, C. J., concurs.

DUNN, J., Concurring.—I think the evidence in this case is sufficient to support the verdict but concur in reversing the judgment and granting a new trial, solely on the ground that the court committed reversible error in giving instruction No. 29, which reads as follows: "The court instructs the jury that a killing is not in self-defense if the defendant having the opportunity to decline further combat in good faith, instead ' continues the struggle or follows the deceased, the result of which is homicide."

Under this instruction a defendant must first in good faith have declined further combat before he can successfully plead self-defense, no matter how savage, dangerous and unprovoked the attack by his antagonist. This is not in harmony with the law of self-defense in homicide cases as laid down in our statute, which reads as follows:

C. S., sec. 8219. "Homicide is also justifiable when committed by any person in either of the following cases: . . . .

"3. When committed in the lawful defense of such person, or of a wife or husband, parent, child, master, mistress or servant of such person, when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished; but such person, or the person in whose behalf the defense was made, if he was the assailant or engaged in mortal (mutual) combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed. . . . . "

I find nothing in the other instructions given that could possibly have cured this error so as to leave the jury with a correct understanding of the law of self-defense, and therefore concur in reversing the judgment and granting a new trial.

McCarthy, J., concurs with Dunn, J.

Lee, J., sat at the hearing, but subsequently finding himself disqualified took no part in the opinion.